# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BIG-D CONSTRUCTION MIDWEST, LLC, an Alaska company,<br><br>Plaintiff,<br><br>v.<br><br>ZURICH AMERICAN INSURANCE COMPANY, a foreign company; ALLIED WORLD NATIONAL ASSURANCE COMPANY, a foreign company,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Civil No. 2:16-cv-00952-BSJ<br><br>The Honorable Bruce S. Jenkins |

## INTRODUCTION

Before the Court is Big-D Construction Midwest, LLC's ("Big-D") Motion for Partial Summary Judgment on its First Cause of Action (Declaratory Judgment on Property Damage) and Second Cause of Action (Breach of Contract),[1] Allied World National Assurance Company's ("Allied World") Cross-Motion for Summary Judgment on all claims,[2] and Zurich American Insurance Company's ("Zurich") Cross-Motion for Summary Judgment on all claims.[3] The Court held oral argument on March 13, 2018. Counsel present for the hearing were: Melissa A. Beutler and Shane W. Clayton on behalf of Big-D Construction Midwest, LLC ("Big-D"), Richard A. Vazquez on behalf of Defendant Zurich American Insurance Company ("Zurich"), and Ian A. Cooper, Emily R. Steinberg, and Tyler Snow on behalf of Allied World National Assurance Company ("Allied World"). The Court reserved judgment at the close of the hearing.

## BACKGROUND

---

[1] Plaintiff's Motion for Summary Judgment, Dkt. No. 130.
[2] Defendant Zurich American's Motion for Summary Judgment, Dkt. No. 129.
[3] Defendant Allied World's Motion for Summary Judgment, Dkt. No. 132.

The parties in this case dispute whether there is coverage under a commercial general liability ("CGL") policy provided by Zurich and an umbrella insurance policy provided by Allied World for damage to non-defective portions of a general contractor's work that are harmed as part of the process of removing and replacing non-compliant lumber installed by a sub-contractor. The following facts were stipulated to by all parties.[4]

Big-D acted as the general contractor on three construction projects: 1700 Plymouth Road in Minnetonka, Minnesota (the "Plymouth Road" Project); 3118 West Lake Street in Minneapolis, Minnesota (the "Lake Street" Project); and 9201 Golden Valley Road in Golden Valley, Minnesota (the "HELLO Apartment" Project).[5] Insurance coverage for these projects was issued to Big-D by Zurich and Allied World, with Zurich issuing a commercial general liability policy (the "Zurich Policy")[6] and Allied World issuing a commercial umbrella policy (the "Allied World Policy").[7]

Big-D entered into a subcontract with J.L. Schwieters ("Schwieters") to supply and install D-Blaze treated framing lumber at the Plymouth Road Project and Lake Street Project (collectively, the "Projects"). Schwieters performed its work at the Projects from March 2016 to June 2016. In performing its work, however, Schwieters installed non-compliant Chicago Flameproof Lumber treated with FlameTech fire treatment (the "CF Lumber") as opposed to D-

---

[4] Stipulation of Facts, Dkt. No.125.
[5] Claims in this action related to indemnity for damages from installation of non-conforming lumber on the HELLO Project are stayed pending resolution of the action in Minnesota determining the underlying question of Big-D's liability, which as of the date of parties' submissions had not been resolved. *See Zurich American Insurance Company v. Big-D Construction Midwest LLC, et al.*, case no. 27-cv-16-14076, pending in Hennepin County Court, Fourth Judicial District, State of Minnesota.
[6] Zurich Policy, Dkt. No. 131, Ex. 1, Appendix to Dkt. 129 Motion For Summary Judgment.
[7] Allied World Policy, Dkt. No. 133, Ex. 20, Appendix to Dkt. No. 132 Motion For Summary Judgment.

Blaze fire treatment. Big-D was unaware that the CF Lumber installed by Schwieters on the Projects was treated with FlameTech fire treatment, not D-Blaze fire treatment.[8]

FlameTech treated lumber was not approved by the projects' architect(s) for installation on the Lake Street Project or Plymouth Road Project. The FlameTech treated lumber did not comply with provisions of the International Building Code applicable to the projects. On or about June 18, 2016, during ongoing construction of the Lake Street Project and Plymouth Road Project, a Building Official for the City of Minneapolis discovered that CF Lumber was treated with FlameTech fire treatment, not D-Blaze fire treatment. Because of Schwieters' defective work, the municipalities for the Projects issued stop work orders preventing further lumber installation on the Projects, and issued correction notices related to the CF Lumber installed by Schwieters. On July 21, 2016, the Lake Street Owner submitted a demand to Big-D to remove the FlameTech treated CF Lumber. On or about July 24, 2016, the Plymouth Road Owner submitted a demand to Big-D to remove the FlameTech treated CF Lumber.

Beginning in August 2016, Big-D removed and replaced the non-conforming FlameTech treated lumber. In order to remove and replace the non-conforming lumber, non-defective components on the project were removed and replaced, including framing system components, sheathing, weather proofing, electrical equipment, mechanical equipment, sill plates, subfloor, roof components, and windows. Big-D incurred costs to remove and replace the non-defective property, and the removal and replacement caused delays in the completion of the Projects.

The removal and replacement of non-conforming CF Lumber happened during the course of ongoing construction on the Projects. CF Lumber was removed and replaced on the Lake Street Project from August 2016 to November 2016. The Lake Street Project was substantially

---

[8] Stipulation of Facts, Dkt. No.125, ¶ 21.

3

complete on April 28, 2017. A temporary certificate of occupancy for the Lake Street Project was issued on April 28, 2017. CF Lumber was removed and replaced on the Plymouth Road Project from August 2016 to September 2016. A Certificate of Substantial Completion was issued for the Plymouth Road Project on April 1, 2017. The Lake Street Project and Plymouth Road Project were completed after the contractual deadline for substantial completion of each construction project.

On July 7, 2016, Big-D notified Zurich of potential claims related to installation of FlameTech treated CF Lumber installed on the Plymouth Road Project, Lake Street Project, and HELLO Project. Big-D likewise notified Allied on July 22, 2016. Both Zurich and Allied subsequently denied any coverage under their respective policies. Big-D commenced the present action on September 12, 2016, to determine the parties' rights and obligations with respect to costs incurred from the Lake Street and Plymouth Projects and indemnity for any damages assessed against Big-D stemming from the HELLO project.

Big-D acknowledges that costs to remove and replace the defective lumber itself do not fall within the scope of the policy. Thus, the only costs at issue are those to repair and replace the non-defective work damaged as part of the process of removing and replacing the non-conforming lumber. Defendants' assert that these damages are not covered by their respective policies. Big-D disagrees, contending that there is coverage under both policies and that there are no applicable exclusions. The two policies are identical in all respects that are material for this claim, other than one exclusionary provision contained in the Allied World Policy alone.

*The Zurich and Allied World Policies*

The Zurich and Allied World Policies each provide that the insurer will pay amounts Big-D becomes legally obligated to pay as damages for "property damage" caused by an "occurrence," with Allied obligated to pay only those sums in excess of the retained limit specified in the policy. "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Property damage" is defined as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Zurich Policy, Dkt. No 131, Ex. 1, p. 15.)[9]

This broad grant of coverage is limited in scope by numerous exclusions. Defendants assert that a number of these exclude the damages at issue. The Zurich and Allied Policies both exclude the following types of damages from coverage:

> **j. Damage to Property**
> "Property damage" to:
>
> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

(Zurich Policy, Dkt. No 131, Ex. 1, pp. 4-5.)[10]

> **n. Recall Of Products, Work Or Impaired Property**

---

[9] *See* Allied World Policy, Dkt. 133, Ex. 20, p. 69, for the equivalent Allied World Policy provision.
[10] *See* Allied World Policy, Dkt. 133, Ex. 20, p. 51, for the equivalent Allied World Policy provision.

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
(1) "Your product";
(2) "Your work"; or
(3) "Impaired property";
if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

(*Id.*, p. 5.)[11]

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

(*Id.*, p. 5.)[12]

Both Policies contain the following definition:

**22.** "Your work":

**a.** Means:
(1) Work or operations performed by you or on your behalf; and
(2) Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

---

[11] *See* Allied World Policy, Dkt. 133, Ex. 20, pp. 58-59, for the equivalent Allied World Policy provision.
[12] *See* Allied World Policy, Dkt. 133, Ex. 20, p. 51, for the equivalent Allied World Policy provision.

> (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and
>
> (2) The providing of or failure to provide warnings or instructions.

(*Id.*, p. 16.) [13]

The Allied World Policy alone contains the following endorsement:

> **Contractors**
>
> This policy does not provide coverage for:
>
> 2. **Property Damage** to property being installed, erected or worked upon by the **Insured** or by any agents or subcontractors of the **Insured**;
>
> 4. any professional services performed by or on behalf of the **Insured**, including but not limited to the preparation or approval of maps, shop drawings, plans, opinions, reports, surveys, field orders, change orders, designs or specifications, and any supervisory, inspection or engineering services;
>
> \* \* \*
>
> Coverage under this policy for such Property Damage will follow the terms, definitions, conditions and exclusions of Scheduled Underlying Insurance, subject to the Policy Period, Limits of Insurance, premium and all other terms, definitions, conditions, and exclusions of this policy. Provided, however, that coverage provided by this policy will be no broader than the coverage provided by Scheduled Underlying Insurance.

(Allied World Policy, Endorsement No. 7, Dkt. 133, Ex. 20, p. 18.)

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

---

[13] *See* Allied World Policy, Dkt. 133, Ex. 20, p. 70, for the equivalent Allied World Policy provision.

56(a). "A 'material fact' is one which could have an impact on the outcome of the lawsuit, while a 'genuine issue' of such a material fact exists if a rational [factfinder] . . . could find in favor of the non-moving party based on the evidence presented." *Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1216 (10th Cir. 2000). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Insurance coverage disputes may be resolved on summary judgment because the construction of an insurance policy is a question of law. *Hartford Acc. & Indem. Corp. v. U.S. Fid. & Guar. Co.*, 765 F. Supp. 677, 679 (D. Utah 1991).

In the insurance context, courts "construe insurance contracts by considering their meaning to a person of ordinary intelligence and understanding ... in accordance with the usual and natural meaning of the words, and in the light of existing circumstances, including the purpose of the policy." *Cincinnati Ins. Co. v. AMSCO Windows*, 921 F. Supp. 2d 1226, 1234 (D. Utah 2013), *supplemented*, No. 2:10-CV-00542-BSJ, 2013 WL 12141330 (D. Utah Sept. 23, 2013), and aff'd, 593 F. App'x 802 (10th Cir. 2014) (internal quotation marks and citations omitted). "Policy terms are harmonized with the policy as a whole, and all provisions should be given effect if possible." *Utah Farm Bureau Ins. Co. v. Crook*, 980 P.2d 685, 686 (Utah 1999). As such, provisions in a policy are not interpreted in isolation but rather "in the light of the [policy] as a whole." *Fort Pierce Indus. Park Phases II, III & IV Owners Ass'n v. Shakespeare*, 379 P.3d 1218, 1225 n.3 (Utah 2016) (quoting *Crook*, 980 P.2d at 686). *See also Midwest Family Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 636 (Minn. 2013) ("We interpret insurance policies using the general principles of contract law....In interpreting insurance contracts, we must ascertain and give effect to the intentions of the parties as reflected in the terms of the insuring

contract...An insurance policy must be construed as a whole, and unambiguous language must be given its plain and ordinary meaning.") (internal citations omitted).

## II. Choice of Law

In a diversity action, a federal district court applies "the substantive law of the forum state, including its choice of law rules." *Pepsi–Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir.2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 495–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)); *Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1076 (10th Cir.2007). If different states' laws would produce different results, a federal court "must look to the conflict of law rules of the forum state to determine which state's law will control." *Desario v. State Farm Mut. Auto. Ins. Co.*, 127 F.3d 1109 (10th Cir. 1997).

The parties disagree whether the case law of the two interested states, Minnesota and Utah, would lead to different results. After reviewing the facts and relevant law in both states, the Court agrees with Defendants that courts in both states would interpret the contract to preclude coverage, as illustrated below. Where there is no conflict, "[t]he interpretation of an insurance contract is governed by state law and, sitting in diversity, [courts must] look to the law of the forum state." *Houston Gen. Ins. Co. v. Am. Fence Co.*, 115 F.3d 805, 806 (10th Cir. 1997).

## III. Application of Utah Law

In cases arising under diversity jurisdiction, the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to "'ascertain and apply the state law.'" *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir.2003) (quoting *Huddleston v. Dwyer*, 322 U.S. 232, 236, 64 S.Ct. 1015, 88 L.Ed. 1246 (1944)); see also *Erie*

*R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The federal court must follow the most recent decisions of the state's highest court. *Wankier*, 353 F.3d at 866.

"Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do." *Id.* In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state, *Progressive Cas. Ins. Co. v. Engemann*, 268 F.3d 985, 988 (10th Cir.2001), appellate decisions in other states with similar legal principles, *United States v. DeGasso*, 369 F.3d 1139, 1148 (10th Cir.2004), district court decisions interpreting the law of the state in question, *Sapone v. Grand Targhee, Inc.*, 308 F.3d 1096, 1100, 1104–05 (10th Cir.2002), and "the general weight and trend of authority" in the relevant area of law, *MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc.*, 436 F.3d 1257, 1262 (10th Cir.2006) (internal quotation marks omitted). "Ultimately, however, the Court's task is to predict what the state supreme court would do." *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665–66 (10th Cir. 2007).

### a. Burden of Proof

In Utah, "[t]he burden of establishing coverage under an insurance policy is on the party who asserts that a loss comes within the coverage of the policy[.]" *Cincinnati Ins. Co. v. AMSCO Windows*, 921 F. Supp. 2d 1226, 1233 (D. Utah, 2013); see also *LDS v. Capitol Life Insurance Co.*, 765 P.2d 857, 859 (Utah 1988). Once the insured makes a prima facie case that the loss falls within the scope of the policy, the burden shifts to the insurer to prove that the claim is not covered because of an exclusion. *Id.*

### b. Construction of Policy Language

Utah courts "interpret words in insurance policies according to their usually accepted meanings and in light of the insurance policy as a whole." *Utah Farm Bureau Ins. Co. v. Crook*, 1999 UT 47, ¶ 5, 980 P.2d 685 (Utah 1999). Any ambiguous or uncertain language that is fairly susceptible to different interpretations should be construed in favor of coverage. *United States Fidelity & Guar. Co. v. Sandt*, 854 P.2d 519, 522 (Utah 1993). "A contract may be ambiguous because it is unclear or omits terms or, . . . 'if the terms used to express the intention of the parties may be understood to have two or more plausible meanings.' However, policy terms are not necessarily ambiguous simply because one party seeks to endow them with a different interpretation according to his or her own interests." *Alf v. State Farm Fire & Casualty Co.*, 850 P.2d 1272, 1274–75 (Utah 1993) (citations omitted). In order to exclude certain losses from coverage, an insurer must use language which "clearly and unmistakably communicates to insured the specific circumstances under which the expected coverage will not be provided." *Id.* at 1275.

### c. General Commercial Liability Policy

#### 1) Scope of Coverage

The scope of the GCL policies in this action extends to "those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage'" that is "caused by an 'occurrence.'"[14] "Property damage" is defined in the policies as either "[p]hysical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured." Here, Big-D alleges that non-defective components removed and replaced during the lumber replacement were physically damaged, and the process

---

[14] Complaint, Dkt. No. 2-2, p. 12.

of removing and replacing the non-defective components led to loss of use of the building project as a whole, thus establishing "property damage" under both definitions.

The phrase "physical injury to tangible property" is not defined by the policies, but is typically interpreted to mean damage to the physical condition of a palpable item of property or an alteration in appearance of the property. *See* 9A Couch on Insurance 3d § 129:6, at 129-16 to 129-17 ("property suffers physical ... injury when property is altered in appearance, shape, color or in some other material dimension"); *Farm Bureau Mut. Ins. Co. v. Earthsoils, Inc.*, 812 N.W.2d 873, 876 (Minn. Ct. App. 2012); *Great Plains Ventures, Inc. v. Liberty Mut. Fire Ins. Co.*, 161 F. Supp. 3d 970, 977 (D. Kan. 2016) (physical loss "in insurance contracts is widely considered to encompass any 'physical alteration' to a structure"). In the present case, the parties stipulate that conforming components were removed in order to replace the lumber. Because such removal is clearly a "physical alteration" to the building projects, the Court finds there is "physical injury" and thus "property damage" under the terms of the policy.

Next, the property damage must be caused by an "occurrence." The term "occurrence" is defined in the policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The Utah Supreme Court has interpreted the term "accident" in the liability insurance context to mean the following:

> First, harm or damage is not accidental if it is the result of actual design or intended by the insured. Second, harm or damage is not accidental if it is the natural and probable consequence of the insured's act or should have been expected by the insured. The first category presents a factual question as to what the insured intended. The second category generally presents a legal question as to what the average individual would expect to happen under the circumstances.

12

*N.M. ex rel. Caleb v. Daniel E.*, 2008 UT 1, ¶ 7, 175 P.3d 566 (Utah 2008).

Thus, under Utah law, damage is not accidental if it is either intended or should have been expected by the insured; and where damage is not accidental, it cannot have been caused by an "occurrence." Utah law further specifies that when determining whether there is an accident, the court is not to examine "whether the underlying act is intentional or deliberate, but rather whether the result of the act was intended or expected." *N.M. ex rel. Caleb v. Daniel E.*, 2008 UT 1, ¶ 11, 175 P.3d 566 (Utah 2008); *see also Cincinnati Ins. Co. v. AMSCO Windows*, No. 13-4155 and 13-4159, 2014 U.S. App. LEXIS 22492 (10th Cir. 2014).

Big-D and Defendants dispute whether the required repair damage was "intended or expected" under the terms of the policy. It is unnecessary to pass on this and related issues because of the limiting exclusions found in both policies, as illustrated and applied below.

Big-D also contends there was property damage in the form of "loss of use" arising from the faulty installation itself, independent of and prior to the repair damage. Their assertions on this point are inconsistent. In their Motion for Summary Judgment, Big-D states that "[t]he loss of use...suffered at the Projects thus constitutes 'property damage' covered by the policies." They also cite this Court's prior Order that "Big-D is legally responsible...for loss of use of *the Project* arising from the delay to project completion arising from incorporation of the deficient lumber."[15] In their Memorandum in Opposition to Allied's Motion for Summary Judgment, however, Big-D states that they seek merely "the costs of repairing *non-defective building components*, which incurred 'property damage' in the form of loss of use and physical injury."[16] Loss of use of the Projects is different from loss of use of the non-defective components that

---

[15] Order Granting Partial Motion for Summary Judgment, Dkt. No. 82 (emphasis added).
[16] Plaintiff's Memorandum In Opposition, Dkt. No. 142 (emphasis added).

13

were damaged in the process of repair, and each would entail different damages. Regardless, the distinction is ultimately irrelevant because both types of "loss of use" damage would be excluded under the policies, as detailed below.

2) **Policy Exclusions**

a. **"Your Work" Exclusions**

The policies both provide that coverage shall be excluded for "property damage" to "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or…[t]hat particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.[17] This exclusion appears to presume that property damage will have only one cause, and thus either "arise out" of operations on the property that was damaged or "arise out" of other property instead. But here, the damage arose out of operations on the lumber, distinct from the non-defective components, *and* from operations on the non-defective components themselves, because these components were damaged during repair operations in which they were involved. This exclusion is ambiguous because it is not clear what type of causation is contemplated by the phrase "arising out of," and thus construed in favor of the insured. Here, there is a plausible interpretation of the provision favorable to Big-D that only requires damage to have arisen *in significant respect* out of operations on property other than that to which the damage occurred, even if it *also* arises to some extent out of operations on the property that was damaged. Thus, the exclusion is inapplicable.

b. **Recall Exclusion**

---

[17] Zurich Policy, Dkt. No 131, Ex. 1, pp. 4-5; Allied World Policy, Dkt. 133, Ex. 20, p. 51.

14

Both policies exclude from coverage "[d]amages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal...repair, replacement, adjustment, removal or disposal of...'Your work'...if such...work...is withdrawn...from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it."[18]

Big-D argues this provision applies only to scenarios where products purchased off the shelf are recalled from the market. As Defendants point out, however, the plain language is nowhere near this restrictive and clearly goes beyond the context of product recalls. It is beyond dispute that the damages claimed by Big-D are covered by this exclusion. 'Your work' is defined in part as "work or operations performed by you or on your behalf."[19] The installation of non-compliant lumber was performed by JL Schwieters on Big-D's behalf. That work must be withdrawn from use by anyone because of an inadequacy. The lumber here was withdrawn from use by Big-D because it did not comply with applicable building codes or the plans of the project architect, and was thus inadequate. Finally, all property damage in this case, including physical damage to the non-defective components and loss of use of the components and the entire project, were incurred by either Big-D or someone else for the removal and replacement of the defective lumber, Big-D's ('Your') work. Thus, Big-D's claimed damages are excluded by the recall provision in both policies.

### c. Damage to Property Not Physically Injured Exclusion

Both policies exclude coverage for property damage to "property that has not been physically injured, arising out of...[a] defect, deficiency, inadequacy or dangerous condition in

---

[18] Zurich Policy, Dkt. No 131, Ex. 1, p. 5; Allied World Policy, Dkt. 133, Ex. 20, pp. 58-59.
[19] Zurich Policy, Dkt. No 131, Ex. 1, p. 16; Allied World Policy, Dkt. 133, Ex. 20, p. 70.

"your product" or "your work"; or...[a] delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.[20]

Big-D is inconsistent in its claims for damages due to "loss of use," but under any reading the damages would be excluded under this provision. Use of the Project as a whole was delayed as a result of the non-conforming lumber. As for the parts of the project that were neither the lumber nor the non-defective components damaged during lumber replacement, this property was not physically injured and any delay was a result of both an inadequacy in Big-D's work, and a failure by someone, JL Schwieters, acting on Big-D's behalf to perform a contract in accordance with its terms, which required lumber treated with a different flame retardant chemical. As for the non-defective components, they were either not physically injured (from the time frame before replacement of the lumber) and thus excluded from coverage under the same logic excluding coverage for the rest of the Project, or they were physically injured (from the time frame after the replacement work) and thus not within this exclusion, though still precluded from coverage by the recall exclusion.

### d. Contractor's Endorsement Exclusion

The Allied World Policy alone contains an endorsement excluding coverage for "Property Damage to property being installed, erected or worked upon by the Insured or by any agents or subcontractors of the Insured...[and] any professional services performed by or on behalf of the Insured[.]"[21] Big-D argues, unconvincingly, that this provision only applies to the property from which the damage arises. Such an interpretation would make part of this endorsement duplicative of the "Your work" exclusion. Furthermore, language in the "Your

---

[20] Zurich Policy, Dkt. No 131, Ex. 1, p. 5; Allied World Policy, Dkt. 133, Ex. 20, p. 51.
[21] Allied World Policy, Endorsement No. 7, Dkt. 133, Ex. 20, p. 18.

16

work" provision limiting the exclusion to "that particular part" of the property being worked on shows the drafters knew how express such a limitation if they had wanted. And finally, nothing in the endorsement says anything whatsoever about the source of the damage, only the property to which damage occurs.

Defendants, on the other hand, argue for an excessively broad reading of the endorsement that encompasses any and all work by Big-D that has not yet been completed or abandoned. The key language in the exclusion is 'property being worked upon.' This language is ambiguous. On the narrow end of the spectrum, it could refer only to work that is, at that very moment, actively undergoing operations. Under this interpretation, after the workers have set down their tools at the end of the day no property is "being worked upon" until they resume the next morning. In the middle of the spectrum, sub-projects, such as flooring or framing, are being worked upon until they are complete. And at the far end of the spectrum, as argued for by Defendants, the entire construction project is 'being worked upon' until the entire construction project is finished. This last interpretation, if accurate, would coincide with another key provision of the policy, the 'Products-Completed Operations Hazard,' which is used to delineate when the project is deemed completed for various purposes of coverage. Referencing this provision would be a convenient and sensible way for the drafters to specify when property was 'being worked upon' for purposes of the endorsement if Allied World's definition was intended. Indeed, the Products-Completed Operations Hazard timeline is explicitly noted throughout the rest of the policy any time it is relevant for qualifying coverage. Here, however, it is conspicuously absent.

In light of the foregoing, the Court finds that two interpretations of the endorsement are plausible. The first, that property is 'being worked upon' from the time work begins on that sub-

17

project until work on that sub-project is completed. Second, that the property is 'being worked upon' from the time the entire project begins to the time the entire project is completed in terms described by the Products-Completed Operations Hazard. Among two plausible interpretations of an ambiguous exclusionary provision, the ambiguity is construed in favor of the policy holder. Thus, the first interpretation governs.

As a result, the endorsement's application depends on whether the non-defective components themselves, as opposed to the entire project, were being worked upon at the time of the property damage. This presents a factual question regarding the point in the process of construction of the sub-project of which the non-defective components formed a part when the damage occurred. This question was not addressed in the parties' stipulations of fact. If the sub-project(s) were unfinished, the endorsement excludes coverage. If the sub-projects were finished prior to removal, the endorsement would not apply. This factual issue would preclude summary judgment if it were the sole grounds for rejecting coverage. It is not, however, for the reasons provided above.

## IV. Application of Minnesota Law

The Court has determined that applying Minnesota law would lead to the same outcome as Utah law. Minnesota courts construing the terms "property damage" and "occurrence" have directly addressed the applicability of these terms to cases of damages incurred in the process of repairing and replacing defective work, and found them not to apply.

Although Minnesota courts have found accidents caused by faulty sub-contractor work to be covered "occurrences" under the language of the policies, in this case no accident resulted from the defective work. The property damage occurred later, by design and in accordance with

the intent of the insured. Minnesota courts do not consider this type of 'rip and tear' damage to be the result of an "occurrence." *Western Nat. Mut. Ins. Co. v. Barbes*, 2006 WL 1704201, *5 (Minn. Ct. App. 2006) ("the damages...occurred...because of repairs deliberately undertaken by appellant as a result of its faulty work. The resulting damage to these items was not an accidental occurrence."); *see also Bright Wood Corp. v. Bankers Standard Ins. Co.*, 665 N.W.2d 544, 548-49 (Minn. Ct. App. 2003) ("...the damage to other property occurred because of repairs deliberately undertaken. The resulting damage is not an accidental occurrence.") In analyzing the facts of this very case in a related action, a Minnesota trial court, applying Minnesota law, found there was no property damage caused by an "occurrence."[22] For these reasons, under Minnesota law the damages at issue would not be property damage caused by an "occurrence" and thus not covered by the policies.

Because Utah and Minnesota law produce the same outcome, a choice of law analysis is unnecessary and the law of the forum state is applied. That state is Utah, whose law supports the finding that the damage at issue is not covered by Defendants' policies.

V. **Plaintiff's Claim for Breach of Good Faith and Fair Dealing**

Defendant Zurich moves for Summary judgment on Plaintiff's claim for breach of good faith and fair dealing. To prevail on this type of claim the Plaintiff must show that Zurich failed to "diligently investigate the facts, and then act fairly and reasonably in evaluating and settling the claim." *Black v. Allstate Ins. Co.*, 100 P.3d 1163, 1169 (Utah 2004). Based on the evidence offered by Plaintiff, and in light of this Court's present decision finding for Zurich on the issue of coverage,

---

[22] *Zurich American Insurance Company v. Big-D Construction Midwest LLC, et al.*, case no. 27-cv-16-14076, Third Judicial District, State of Minnesota. ("replacement costs related to defective work and materials, does not fit within the policy definition of property damage.")(quoting *Themex Corp. v. Fireman's Fund Ins. Co.*, 393 N.W.2d 15 (Minn. Ct. App. 1986).

no reasonable jury could find that Zurich acted in bad faith. For these reasons, the Court grants Zurich's motion for summary judgment on this claim.

## CONCLUSION

Having determined that exclusions apply in both policies to preclude coverage, neither Zurich nor Allied World are obligated under the policies to reimburse or indemnify Big-D for costs from non-defective portion of Big-D's work damaged in the process of replacing defective lumber, nor for costs due to loss of use. Zurich did not breach their duty of good faith and fair dealing.

The Court hereby orders: (i) Big-D's Motion for Summary Judgment on their First and Second Cause of Action is DENIED; (ii) Zurich and Allied World's Motions for Summary Judgment on Big-D's first, second and third causes of action are GRANTED; and the causes are DISMISSED WITH PREJUDICE.

The Final Pretrial Conference set for June 27, 2018 at 10:00 a.m. is hereby vacated Let judgment be entered accordingly.

DATED this 18 day of May, 2018.

Bruce S. Jenkins
United States Senior District Judge